**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

BREGMAN, BERBERT & SCHWARTZ,
L.L.C.; DOUGLAS M. BREGMAN,
Plaintiffs-Appellants,

v.

UNITED STATES OF AMERICA,                    No. 97-1624
Defendant-Appellee.


ALAN F. POST,
Movant.

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Alexander Williams, Jr., District Judge.
(CA-96-715-AW)

Argued: April 7, 1998

Decided: June 5, 1998

Before WILKINSON, Chief Judge, and HAMILTON and
MICHAEL, Circuit Judges.

_____

Affirmed in part, vacated in part, and remanded by published opinion.
Judge Hamilton wrote the opinion, in which Chief Judge Wilkinson
and Judge Michael joined.

_____

**COUNSEL**

**ARGUED:** Glenn Marshal Cooper, PALEY, ROTHMAN, GOLD-
STEIN, ROSENBERG & COOPER, CHTD., Bethesda, Maryland,

for Appellants. Steven Wesley Parks, Tax Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** David M. Rothenstein, PALEY, ROTHMAN, GOLDSTEIN, ROSENBERG & COOPER, CHTD., Bethesda, Maryland, for Appellants. Loretta C. Argrett, Assistant Attorney General, William S. Estabrook, Lynne A. Battaglia, United States Attorney, Tax Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

_____

**OPINION**

HAMILTON, Circuit Judge:

This appeal involves a wrongful levy action against the United States brought by the law firm of Bregman, Berbert & Schwartz, L.L.C. (the Bregman Firm) and attorney Douglas Bregman to recover $104,000 the United States used to partially satisfy delinquent federal taxes owed by a second law firm, Alan F. Post, Chartered (the Post Firm). At the time of the levy, the $104,000 was on deposit in a bank account in the name of the Post Firm. The Bregman Firm and Douglas Bregman claim that, at the time of the levy, they held the sole ownership interests in the funds pursuant to a written fee-sharing agreement in a tort case. The district court granted summary judgment in favor of the United States, and the Bregman Firm and Douglas Bregman now seek reversal. For the reasons that follow, we affirm in part, vacate in part, and remand for further proceedings consistent with this opinion.

I.

In 1988, Stanley Taylor (Taylor) was diagnosed with chronic myelogenous leukemia, which he believed was caused by exposure to benzene during his employment. Subsequently, Taylor interviewed Douglas Bregman in Bethesda, Maryland for the purpose of filing a claim for workers' compensation benefits. Because his firm did not handle workers' compensation claims, Douglas Bregman referred Taylor to an attorney named Alan Post of the Post Firm who had considerable experience in this field. The Post Firm was also located in Bethesda, Maryland.

2

Taylor subsequently retained the Post Firm to handle a workers' compensation claim, which the Post Firm pursued successfully. Taylor also retained the Post Firm to file a separate tort action against the manufacturers and suppliers of benzene. The retainer agreement with respect to this separate action (Taylor's Tort Action) provided that the Post Firm would receive one-third of any recovery if the case settled and 40% if it had to file suit on behalf of Taylor and conduct discovery. The agreement also provided that the Post Firm could employ associate counsel at its discretion without any increase in the attorneys' fees to be paid by Taylor.

In accordance with this agreement, the Post Firm associated the Bregman Firm as co-counsel and entered into a written fee-sharing agreement, whereby the Bregman Firm would be entitled to 25% of the total contingency fee.[1] Subsequently, the Bregman Firm and the Post Firm associated attorney Barry Nace of the law firm Paulson, Nace, Norwind & Sellinger (the Paulson Firm) as lead counsel. As a condition of assuming the role of lead counsel, the Paulson Firm insisted on receiving two-thirds of the total contingency fee. At this point, the Post Firm and the Bregman Firm, through Alan Post and Douglas Bregman, agreed in writing to a revised fee-sharing arrangement between themselves, whereby the Post Firm and the Bregman Firm would split one-third of the total contingency fee on a 60%/40% basis favoring the Post Firm.

Taylor's lawsuit was settled favorably in late 1994, resulting in a total contingency fee of $780,000. The Paulson firm handled the disbursement of the settlement proceeds. For reasons unexplained in the record, rather than cutting the Post Firm a check for $156,000 and the Bregman Firm a check for $104,000, representing each firm's respective fee under the revised fee agreement, the Paulson Firm cut one check in the amount of $260,000 made payable solely to the Post Firm. The check was dated November 1, 1994, and following the printed word "For" near the bottom of the check were the handwritten words "BENZENE/TAYLOR-Atty fee." (J.A. 28).

_____

[1] This agreement was specifically negotiated between Alan Post and Douglas Bregman.

3

After receiving the check from the Paulson Firm for $260,000, the Post Firm converted it to a cashiers check at Century National Bank in Washington, D.C. and deposited the cashiers check into its escrow account at Citibank, also in Washington, D.C. The Post Firm then transferred the bulk of the $260,000 into its operating account at Mellon Bank in Rockville, Maryland with $130,000 being deposited by one check.[2] At this point, the Post Firm refused to pay the Bregman Firm 40% of the $260,000 as the two firms had agreed in the revised fee agreement, arguing that it did not owe the Bregman Firm any fee because the Bregman Firm did not perform any material services and/or assume any significant responsibility for the benefit of either Taylor or the Post Firm as a condition for accepting a fee as set forth by Rule 1.5(e) of the Maryland Rules of Professional Conduct for Lawyers (MLRPC). The Bregman Firm disagreed and demanded that the Post Firm place the disputed funds in a separate attorney trust account pursuant to MLRPC Rule 1.15(c).[3]

Intent on complying with MLRPC 1.15(c), on November 25, 1994, the Post Firm opened an account entitled "Alan F. Post Chartered Disputed Fees Account" (the Disputed Fees Account) at the Mellon Bank and deposited $104,000. (J.A. 142). The $104,000 comprised $70,000 drawn by check by the Post Firm on its operating account at Mellon bank, $14,000 drawn by check by the Post Firm on its escrow account at Citibank, and an additional check in the amount of $20,000 that the Post Firm had received from the Paulson Firm as a fee in a related case. The $20,000 check was dated November 1, 1994, and following

_____

[2] The record is undisputed that at least $14,000 of the $260,000 remained in the escrow account at Citibank after the bulk of the $260,000 had been transferred to the operating account at Mellon Bank.

[3] MLRPC 1.15(c) provides:

> When in the course of representation a lawyer is in possession of property in which both the lawyer and another person claim interests, the property shall be kept separate by the lawyer until there is an accounting and severance of their interests. If a dispute arises concerning their respective interests, the portion in dispute shall be kept separate by the lawyer until the dispute is resolved.

4

the printed word "For" near the bottom of the check were the hand-written words "BENZENE/MONTGOMERY-Atty fee." **4** (J.A. 241).

Just a few days after the creation of the Disputed Fees Account, the Post Firm filed a declaratory judgment action against the Bregman Firm and Douglas Bregman in Maryland state court, asserting that its honoring of the 60%/40% fee arrangement would violate MLRPC Rule 1.5(e).**5**

The Bregman Firm promptly responded with a counterclaim for declaratory judgment and for breach of contract. In its answer, the Bregman Firm recited the revised fee agreement and asserted, among other things, that it had engaged in a wide array of legal services in connection with Taylor's Tort Action, that it was co-counsel of record throughout the litigation, that it was jointly responsible for Taylor's representation, and that the Post Firm never requested any participation or provision of services from it that it did not fully satisfy.

While this lawsuit was pending, on December 22, 1994, the Internal Revenue Service (IRS) of the United States of America (the government) served a notice of levy on the Post Firm's accounts at Mellon Bank, including the Disputed Fees Account. As of December 1994, the Post Firm owed the government approximately $220,000 in back taxes. The Post Firm agreed to give the government the

_____

**4** The record is somewhat unclear on the exact nature of this related case, but as far as we can discern, it was one of several cases of the same nature as Taylor's by different plaintiffs against the same defendants. Apparently, all of these cases, including Taylor's, were settled at the same time in a global settlement.

**5** MLRPC Rule 1.5(e) provides:

> A division of fees between lawyers who are not in the same firm may be made only if:
>
> (1) the division is in proportion to the services performed by each lawyer or, by written agreement with the client, each lawyer assumes joint responsibility for the representation;
>
> (2) the client is advised of and does not object to the participation of all the lawyers involved; and
>
> (3) the total fee is reasonable.

5

$104,000 in the Disputed Fees Account in exchange for the government releasing the levy on its payroll account.

On June 19, 1995, the Circuit Court for Montgomery County, Maryland entered an order granting the Bregman Firm's motion for summary judgment on its breach of contract counterclaim and entered judgment in favor of the Bregman Firm in the amount of $112,881, consisting of $104,000 in contingency fees as called for in the revised fee agreement, $2,233 in funds that it contributed to Taylor's Tort Action, and $6,648 in pre-judgment interest. The circuit court determined that the ethical rule cited by the Post Firm could not serve as a defense to a breach of contract claim. The circuit court then declared that there was no longer a dispute requiring a declaratory judgment, and therefore, dismissed both the Post Firm's complaint and the Bregman Firm's counterclaim for declaratory judgment.

The Post Firm appealed this decision to the Maryland Court of Special Appeals, which affirmed across the board in a decision issued on December 24, 1996. See Alan F. Post, Chartered v. Bregman, 686 A.2d 665 (Md. Ct. Spec. App. 1996). The Maryland Court of Appeals subsequently reversed this decision and remanded the case to the Maryland Court of Special Appeals with instructions to remand to the circuit court for further proceedings consistent with its opinion. See Alan F. Post, Chartered v. Bregman, 1998 WL 12565 at *15 (Md. Jan. 15, 1998) (to be reported at 707 A.2d 806). This disposition was prompted by the Maryland Court of Appeals' holding in the case that MLRPC Rule 1.5(e) constitutes "a supervening statement of public policy to which fee-sharing agreements by lawyers are subject, and that the enforcement of Rule 1.5(e) is not limited to disciplinary proceedings," but rather "may extend to holding fee-sharing agreements in clear and flagrant violation of Rule 1.5(e) unenforceable . . . ." Id. at *13 The court then took great pains to explain the proper analysis that the circuit court should undertake on remand with respect to the Post Firm's defense resting on MLRPC 1.5(e). Id. at *14. This case remains pending on remand.

In March 1996, prior to the Maryland Court of Appeals' decision, the Bregman Firm and Douglas Bregman brought the wrongful levy action that is the subject of this appeal against the government in

6

United States District Court for the District of Maryland.**6** <u>See</u> 26 U.S.C. § 7426(a)(1) (allowing third party whose property has been confiscated by the government to satisfy another party's tax liability to sue the government for wrongful levy). At the close of discovery, the parties filed cross-motions for summary judgment. The district court granted the government's motion for summary judgment and denied the Bregman Firm's cross-motion. The district court's order was accompanied by a memorandum opinion in which the district court concluded: (1) the funds in question belonged to the Post Firm, and therefore, were subject to the government's lien; and (2) the lien was superior to that of the Bregman Firm with respect to said funds. The Bregman Firm noted a timely appeal to this court, seeking reversal of the district court's entry of summary judgment in favor of the government.**7**

II.

A.

Summary judgment in favor of a defendant in a civil action is appropriate when, after adequate time for discovery and upon motion, the plaintiff "fails to make a showing sufficient to establish the existence of an element essential to [the plaintiff's] case, and on which [the plaintiff] will bear the burden of proof at trial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). Accordingly, summary judgment was inappropriate in this case if the Bregman Firm presented sufficient evidence on each element of its claim such that a jury could reasonably find for the Bregman Firm. <u>See Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). We review <u>de novo</u> the district court's decision to grant summary judgment in favor of the government. <u>See Smith v. Virginia Commonwealth Univ.</u>, 84 F.3d 672, 675 (4th Cir. 1996) (<u>en banc</u>). In so doing, we must view the evidence in the light most favorable to the Bregman Firm. <u>See id.</u>

_____

**6** For ease of reference, we will refer only to the Bregman Firm as the plaintiff in this action.
**7** Initially, the Bregman Firm also sought reversal of the district court's decision denying it summary judgment. However, the Bregman Firm abandoned this issue at oral argument by candidly admitting that the record contained disputed issues of material fact.

B.

Internal Revenue Code (I.R.C.) § 6321 authorizes the imposition of a lien in favor of the government in the amount of unpaid taxes on "all property and rights to property, whether real or personal, belonging to [a delinquent taxpayer]." 26 U.S.C.§ 6321. By the plain terms of this provision, if the property levied upon does not belong to the delinquent taxpayer, the government's lien is invalid. If the government actually levies upon or confiscates the property of a third party, the third party can bring a wrongful levy action against the government pursuant to I.R.C. § 7426(a)(1), which provides:

> If a levy has been made on property or property has been sold pursuant to a levy, any person (other than the person against whom is assessed the tax out of which such levy arose) who claims an interest in or lien on such property and that such property was wrongfully levied upon may bring a civil action against the United States in a district court of the United States. Such action may be brought without regard to whether such property has been surrendered to or sold by the Secretary.

26 U.S.C. § 7426(a)(1). Of relevance here, a levy is wrongful within the meaning of this provision if: (1) "the levy is upon property in which the taxpayer had no interest at the time the lien arose or thereafter"; or (2) "the levy or sale pursuant to levy will or does effectively destroy or otherwise irreparably injure [a third party's] interest in the property which is senior to the Federal Tax lien." 26 C.F.R. § 301.7426-1(b); see Sessler v. United States, 7 F.3d 1449, 1451 (9th Cir. 1993). State law governs questions of who has or had a property interest in the levied property at the time of the levy and the precise nature of that interest, but federal law governs questions of priority between conflicting interests in the levied property. See, e.g., United States v. Nat'l Bank of Commerce, 472 U.S. 713, 722 (1985). The parties agree that Maryland law governs the property interest questions presented in this appeal.

The overarching question presented in this appeal is whether the Bregman Firm presented sufficient evidence from which a reasonable jury could find that the Bregman Firm had an interest in all or part

8

of the $104,000 in the Disputed Fees Account to the exclusion of the Post Firm. In answering this question in the negative, the district court exclusively relied on the following two facts: (1) the disputed funds were in a bank account under the name of the Post Firm only; and (2) the disputed funds had been paid to the Post Firm by one of its clients.

The district court's analysis is erroneous because these two facts are not dispositive of the property interest questions presented in this appeal. First, we can find no Maryland authority for the proposition that a party gains an ownership interest in property simply by exercising dominion and control over it. Second, assuming without deciding that the Post Firm received the disputed funds from Taylor--and not the Paulson Firm, as the undisputed evidence establishes--we fail to see the legally dispositive nature of this assumed fact.

In order to determine whether the district court erred in granting summary judgment in favor of the government, we must decide: (1) whether the Bregman Firm has presented sufficient evidence from which a reasonable jury could trace the funds at issue from the settlement proceeds in Taylor's Tort Action to the Disputed Fees Account; and (2) whether the Bregman Firm has presented sufficient evidence of ownership of the disputed funds at the time of the levy. We reject at the outset the government's argument that, even if the funds are traceable, and even if the revised fee agreement is enforceable, the Bregman Firm cannot prevail because at most the Bregman Firm would have a right to receive a generic sum of $104,000 from the Post Firm, not $104,000 of the $260,000 that the Post Firm received from the Paulson Firm. The revised fee agreement speaks for itself on this issue. In that agreement, the Post Firm and the Bregman Firm clearly agreed to split on a 60%/40% basis one-third of the total contingency fee in Taylor's Tort Action, regardless of which firm came into possession of those funds first.

We now turn to the tracing question. The Bregman Firm relies on the equitable remedy of a constructive trust and its accompanying tracing rule that, if a person mixes trust funds with his own funds in one bank account, withdrawals from the commingled funds are presumed to be funds owned by the person withdrawing the funds and not trust funds. See Brown v. Coleman, 566 A.2d 1091, 1097 (Md. 1989). Under Maryland law, the equitable remedy of a constructive

9

trust "`is applied by operation of law where property has been acquired by fraud, misrepresentation, or other improper methods, or where the circumstances render it inequitable for the party holding the title to retain it. . . .'" Id. (quoting Wimmer v. Wimmer, 414 A.2d 1254, 1258 (Md. 1980)). A prerequisite to the imposition of a constructive trust under Maryland law is that the purported beneficiary must be able to trace the property at issue. Id. Under these principles, the Bregman Firm must present sufficient evidence from which a reasonable jury could find that the funds in the Disputed Fees Account were traceable to the original one-third contingency fee at the time the government imposed its levy on the Disputed Fees Account, and from which it can be determined that it would be inequitable for the Post Firm to retain the funds in the Disputed Fees Account.

Viewing the evidence in the light most favorable to the Bregman Firm, as we must do in this appeal, $84,000 in the Disputed Fees Account is traceable from the original one-third contingency fee in Taylor's Tort Action. The record establishes that the Post Firm received a check from the Paulson Firm drawn on an account at Century National Bank in the amount of $260,000, representing one-third of the total contingency fee in Taylor's Tort Action. That check was converted into a cashier's check at Century National Bank and deposited the same day into the Post Firm's Citibank escrow account. A few days later, on November 7, 1994, the Post Firm transferred $130,000 from its Citibank escrow account to its operating account at Mellon Bank. Thereafter, upon demand by the Bregman Firm, the Post Firm established the Disputed Fees Account with three checks.

The first two checks are traceable to the one-third contingency fee in Taylor's Tort Action. The first check, in the amount of $70,000, was drawn on the Post Firm's operating account at Mellon Bank on November 23, 1994. Viewed in the light most favorable to the Bregman Firm, the evidence shows that at all times between November 7 and November 23, 1994, the balance in the operating account did not dip below $70,000, and therefore, one can presume that the $70,000 check constituted a portion of the one-third contingency fee in Taylor's Tort Action. See Brown, 566 A.2d at 1097-98, 1100. The second check, in the amount of $14,000 and deposited on November 25, 1994, came straight from the Citibank escrow account, which at the time maintained at least $14,000 of the one-third contingency fee in

10

Taylor's Tort Action. Because the evidence viewed in the light most favorable to the Bregman Firm establishes that the balance in the Citibank escrow account did not dip below $14,000 prior to November 25, 1994, one can presume that the $14,000 check constituted a portion of the one-third contingency fee in Taylor's Tort Action. See id. The third check was a $20,000 cashier's check that had been converted from a $20,000 check that the Post Firm had received from the Paulson Firm on November 1, 1994 as a fee for work the Post Firm did in a related case for a plaintiff named Montgomery. Because the $20,000 was not part of the original one-third total contingency fee in Taylor's Tort Action, the Bregman Firm has no claim to that amount under the revised fee agreement, and the district court properly granted summary judgment in favor of the government with respect to this $20,000.

Assuming that the revised fee agreement is enforceable, the Bregman Firm has presented sufficient evidence from which it can be determined that it would be inequitable to allow the Post Firm to retain the benefit of the $84,000 traceable to the Bregman Firm at the time the government imposed its levy on the Disputed Fees Account. Specifically, if the revised fee agreement is determined by the Maryland courts to be enforceable and the evidence of tracing is credited, to allow the Post Firm to retain the benefit of the disputed funds would unjustly enrich the Post Firm. See Brown , 566 A.2d at 1097 (Md. 1989) ("The purpose of the remedy [of a constructive trust] is to prevent the unjust enrichment of the holder of the property.").

Turning to the question of whether the Bregman Firm presented sufficient evidence of ownership in $84,000 of the disputed funds at the time of the levy, we conclude that it did. The revised fee-sharing agreement clearly provided that the Bregman Firm would be entitled to 40% of one-third of the total contingency fee in Taylor's Tort Action. If enforceable, this agreement serves to evidence ownership by the Bregman Firm in the $84,000 left at issue, assuming of course that all of the tracing issues are resolved in favor of the Bregman Firm.

11

III.

In conclusion, we affirm the district court's entry of summary judgment in favor of the government with respect to the $20,000 that was on deposit in the Disputed Fees Account that is traceable to payment of attorney's fees in the Montgomery tort action, but vacate the district court's entry of summary judgment in favor of the government with respect to the $84,000 that we have identified and remand for further proceedings consistent with this opinion. However, in the interest of comity, we believe the enforceability of the revised fee agreement should be resolved by the Maryland courts. Accordingly, we instruct the district court on remand to hold this case in abeyance until the Maryland courts finally resolve whether the revised fee agreement is enforceable under Maryland law.**8**

<u>AFFIRMED IN PART, VACATED
IN PART, AND REMANDED</u>

_____

**8** The Bregman Firm presented an alternative argument for the first time on appeal that even if it did not have a property interest in the disputed funds, it possessed a superpriority lien under I.R.C. § 6323(b)(8) that was superior to that of the government. Because the Bregman Firm failed to present this argument below and has failed to show an exceptional circumstance that prevented it from so doing, we decline to address this argument. <u>See United States v. One 1971 Mercedes Benz, etc.</u>, 542 F.2d 912, 915 (4th Cir. 1976) ("Questions not raised and properly preserved in the trial forum will not be noticed on appeal in the absence of exceptional circumstances.").